IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARK ANTHONY NOONAN,<br><br>Defendant. | No. CR12-1016<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.   INTRODUCTION ............................................. 1

II.  PROCEDURAL HISTORY ....................................... 2

III. RELEVANT FACTS ........................................... 2

IV.  ISSUES PRESENTED ......................................... 9

V.   DISCUSSION ............................................... 9
     A.  Did the Vehicle Stop Violate the Fourth Amendment? ... 9
     B.  Did Kennedy's Dialogue with Defendant Violate the
         Fifth Amendment? ................................... 13
         1.  Interrogation .................................. 13
         2.  Public Safety Exception ........................ 15

VI.  SUMMARY ................................................. 18

VII. RECOMMENDATION .......................................... 18

I. INTRODUCTION

On the 13th day of December 2012, this matter came on for hearing on the Motion to Suppress (docket number 13) filed by the Defendant on August 22, 2012. The Government was represented by Assistant United States Attorney Patrick J. Reinert.

Defendant Mark Anthony Noonan appeared in court and was represented by his attorney, Anne M. Laverty.

## II. PROCEDURAL HISTORY

On July 18, 2012, Defendant Mark Anthony Noonan was charged by Indictment with possession of precursors used to manufacture methamphetamine. Defendant pleaded not guilty and trial was scheduled for September 24, 2012. On August 22, Defendant timely filed the instant motion to suppress and a hearing was scheduled for September 4. Prior to the hearing, however, Defendant was committed to the custody of the Attorney General for a competency evaluation. Accordingly, both the motion hearing and the trial were continued.[1] Because of the pending motion to suppress, the trial was continued again and is now scheduled for February 4, 2013.

## III. RELEVANT FACTS

On March 25, 2012, Dubuque County Deputy Sheriff Joseph L. Kennedy was on routine patrol, working the night shift. At approximately 2:30 a.m., Kennedy was heading east on Highway 20 on the west side of Dubuque. Kennedy testified that the bars close in Dubuque at 2:00 a.m., "so between 2:00 and 3:00 is usually a pretty good time to find drunk drivers or impaired drivers."

As Deputy Kennedy was heading eastbound near Menard's, which is on the west end of Dubuque, he observed a black Cadillac heading westbound being driven "well under the speed limit." Kennedy engaged his radar unit and it displayed a speed of 40 miles per hour in a 55 miles-per-hour zone. Highway 20 at that location is a four-lane divided highway, and Kennedy believed that "it could possibly be a drunk driver." According to Kennedy, people who are impaired on alcohol and drugs have a tendency to "over think things a little bit" and they sometimes "are a little bit too cautious." Kennedy

---

[1] Defendant was examined at the Metropolitan Correctional Center in Chicago, Illinois. A report by David Szyhowski, Psy.D., states that Defendant is competent to stand trial. At the instant hearing, both sides confirmed that they had received Dr. Szyhowski's report, and neither party is claiming Defendant is not competent to stand trial.

2

testified that it was normal for drivers to drive slightly under the speed limit at night, because it's dark out and they can't see deer or other obstructions on the roadway, "but for a vehicle to drive 15 miles an hour under the posted speed limit is just not something you would see from the normal motoring public."

Deputy Kennedy turned his vehicle around in order to investigate further. After Kennedy caught up to the car, he watched "its driving to see if it was weaving or anything like that, which it wasn't." After Kennedy did not observe any evidence of impaired driving, he pulled into the inside passing lane and pulled up next to the vehicle to see if he could observe "any kind of equipment violation or anything like that." When he pulled even, however, the other vehicle slowed down even more, turned on his blinker, and got behind Kennedy. A short while later, the vehicle turned left into Mile Hill Lane, which is a dead end containing a couple of businesses and a "mini storage" facility. According to Kennedy, that was the first turn where the car could have turned after he got behind Kennedy.

Deputy Kennedy thought it was "odd" that the vehicle would turn in there because Mile Hill Lane is a dead end and there are just a few businesses back there. At the hearing, Kennedy opined that Defendant "was trying to avoid" him. Kennedy testified that he had also been advised there was "a rash of storage shed burglaries" in the Dubuque area at that time. According to Kennedy, he did not know if that specific storage facility had been hit, but he knew of at least a couple of other mini storage facilities in Dubuque which had been burglarized. Because his suspicions had been aroused, Kennedy decided to go back and investigate further.

Deputy Kennedy, who was now traveling west, was unable to turn around immediately because of a raised concrete median. As Kennedy was rounding a curve to get to the next available turn around, he glanced over his shoulder and could see that the car was now making a U-turn on Mile Hill Lane and coming back out onto Highway 20. In other words, as Deputy Kennedy turned around and started heading eastbound again –

toward the spot where the car had turned in – the car headed back westbound on Highway 20 – the original direction it was traveling in. Kennedy then turned around a third time and pursued the vehicle westbound on Highway 20. Before Kennedy could catch the vehicle, it had turned left again on North Cascade Road.[2] According to Kennedy, North Cascade Road was the first road the vehicle could have turned on after Mile Hill Lane.

Deputy Kennedy caught the vehicle shortly after it turned left on North Cascade Road, and the vehicle stopped promptly after Kennedy activated his emergency lights.[3] The vehicle stopped adjacent to a driveway to a trailer park. While the vehicle did not block the driveway, Kennedy testified that he believed it would impair the vision of someone coming from the driveway onto North Cascade Road. Having viewed the videotape, the Court agrees with that assessment.

Defendant Mark Anthony Noonan was the driver of the vehicle and alone in the car. When Deputy Kennedy approached the vehicle, he asked Defendant "do you know why I'm stopping you?" Defendant responded "no, not really." When Kennedy started to explain that "I was kind of wondering what . . . ," Defendant interrupted and told Kennedy that he "took the wrong turn down there when I was talking to my friend on the phone," he was heading to his friend's house, and "I figured that was why you turned around." Kennedy obtained Defendant's driver's license and started back to the squad car. As Kennedy was walking back to the squad car, however, Defendant stuck his head out the window and called Kennedy back. At that time, Defendant explained that his driver's license had been suspended until December 7, but that it had been taken care of and he just needed to "pay the $20 and have my picture taken."

Deputy Kennedy then went back to the squad car and was advised by dispatch that there was a warrant outstanding for Defendant's arrest in Clayton County. Kennedy went

---

[2] A Google map of the area was introduced as Defendant's Exhibit B.

[3] A DVD recording of the stop and subsequent events was introduced as Government's Exhibit 1.

4

back up to Defendant's car, got Defendant out of the vehicle, and placed him under arrest. Defendant was on the phone when he got out of the car and, prior to being handcuffed, placed the phone on the trunk. Defendant also put his car keys on the trunk. Kennedy started to pat Defendant down and felt an object in his right front jeans pocket. Kennedy asked "is that a pipe," and Defendant appeared to answer affirmatively. At the hearing, Kennedy testified that he removed a meth pipe from Defendant's pocket and placed it on the trunk. Kennedy asked Defendant if there was "any stuff in the car," and Defendant appeared to answer negatively. Kennedy then searched Defendant's person incident to the arrest and placed the contents of Defendant's pockets on the trunk.

Deputy Kennedy asked Defendant what the Clayton County warrant was for, and Defendant stated "I have no clue, man." Defendant was then was placed in the back of Kennedy's squad car. Kennedy told Defendant that the warrant was issued on the 20th. Defendant said he was just at the jail on Wednesday, visiting his girlfriend. Kennedy replied that Wednesday was the 20th, but "they probably didn't know about it then." Defendant then told Kennedy that "my dad is dying," and asked if he could phone him. Kennedy told Defendant that he could call when they arrived at the law enforcement center.

At that point, Deputy Kennedy told Defendant that "I'll move the car here quick and I got the pipe out of there and I'll take a quick look through it and then we'll be on our way." Kennedy then walked up to Defendant's car. Kennedy took the items which had been placed on the trunk of Defendant's car and put them in his pocket. As he approached the door of Defendant's car, however, Defendant yelled and whistled at Kennedy. Kennedy then returned to the squad car, where the following conversation occurred:

  Kennedy: Are you yelling at me?

  Defendant: Ya.

  Kennedy: What's up?

| | |
|---|---|
| Defendant: | There's a dude coming down here to get my car. |
| Kennedy: | Rick? |
| Defendant: | Ya. |
| Kennedy: | Okay, 'cause the phone, your phone . . . I was trying to hang it up and it says someone's still connected. [showing defendant] Do I take it to mean he's still on the line there? |
| Defendant: | You might want to wait for him to get here. |
| Kennedy: | I'm just going to pull the car ahead. |
| Defendant: | No, seriously, he left something in my car, man. |
| Kennedy: | Is there meth in there? |
| Defendant: | No, there's no meth. |
| Kennedy: | Alright, what's in there? |
| Defendant: | He left something, he left . . . there's a black bag on the floorboard of my car that he left in there. That's what I was taking to him. |
| Kennedy: | Okay, what's in it? |
| Defendant: | I really don't know. |
| Kennedy: | Will it hurt me? |
| Defendant: | It shouldn't. I didn't smell nothin' out of it or feel anything out of it. |
| Kennedy: | Okay. |
| Defendant: | He left it in my . . . he was over there with his girlfriend at Heritage Pond. |

| | |
|---|---|
| Kennedy: | Okay. |
| Defendant: | And he just called me a little bit ago, texted me actually, and asked me if I could bring him his book bag. I know there's a can of ether in there. I'm not sure what else is in there. |
| Kennedy: | Well, does he have a one-pot in there? |
| Defendant: | No, no, no, there shouldn't be no lab in there. He said there was just materials in there. |
| Kennedy: | Well, I appreciate the heads-up. What's your friend's name? I'll find out in a minute when I get there. |
| Defendant: | Tuttle. |
| Kennedy: | Rick Tuttle? Okay. |

The conversation took just less than two minutes. Deputy Kennedy then went back up to Defendant's vehicle. By that time, another officer had arrived at the scene. Discovering that the vehicle was locked, Kennedy took the keys from his pocket (which he had previously retrieved from on top of the trunk) and opened the car. Kennedy removed a black back pack from the passenger side of the vehicle, placed it on the ground at the rear of the vehicle, and started to examine its contents. Kennedy stopped abruptly, when he reacted to a strong odor. Kennedy testified at the hearing that the odor seemed to come from a glass Mason jar containing a "white ashy substance." Defendant, who observed the activity from the backseat of the squad car, asked Kennedy about his reaction.

| | |
|---|---|
| Defendant: | What happened, man? |
| Kennedy: | Well, there's fuckin' ammonia or something in that jar. |
| Defendant: | What jar? |
| Kennedy: | The jar I just pulled out of that . . . |

7

Defendant: There's a jar in there?

Kennedy: Ya.

Defendant: Oh, fuck. He told me all that was in there was a thing of liquid heat and a can of starting fluid. I knew I should never have fuckin' believed him.

Kennedy: I'm not sure what that shit is there.

Defendant: Mother fucker, man.

Kennedy: What's Rick driving?

Defendant: I think that was him that went by, man.

Kennedy: In that Cadillac?

Defendant: He's living with this really rich guy that lives up here. He owns a bunch of land and he sold most of his farm to the city for that new highway. His name is John something, man.

Kennedy: Oberbroeckle?

Defendant: I don't know.

Kennedy: Ya, he lives down the hill by the park down there?

Defendant: I've only been out there one time. It was at night. It's a brand new house.

Kennedy: How often are they cookin' out there?

Defendant: I have no fuckin' clue man. Honestly, I really don't know. I went out there one time and he had something going and I left. I had my buddy pick me up.

There was no further interaction with Defendant at the scene. Defendant was subsequently transported to the jail by another officer.

## IV. ISSUES PRESENTED

In his motion to suppress, Defendant raises two issues: First, Defendant asserts that his vehicle was stopped without reasonable suspicion of criminal activity, thereby violating his Fourth Amendment rights. Second, Defendant argues that Deputy Kennedy interrogated him at the scene without giving him a *Miranda* warning, in violation of his Fifth and Sixth Amendment rights against self-incrimination and right to counsel.

## V. DISCUSSION

### A. Did the Vehicle Stop Violate the Fourth Amendment?

Defendant first argues that Deputy Kennedy did not have a reasonable, articulable suspicion that Defendant was engaged in criminal activity and, therefore, the stop violated the Fourth Amendment. The Fourth Amendment protects against unreasonable searches and seizures. A traffic stop constitutes a seizure of the vehicle's occupant. *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012). Accordingly, a traffic stop "must be supported by reasonable suspicion or probable cause." *Id.* at 706. "Reasonable suspicion" exists when the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). Moreover, any traffic violation, however minor, provides probable cause for a traffic stop. *Id.* Accordingly, the Court must determine whether the facts known to Kennedy "viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Deputy Kennedy's attention was first drawn to Defendant's vehicle when it was observed traveling 40 miles per hour in a 55 miles-per-hour zone. Highway 20 at that location is a four-lane divided highway. Given the time of night (approximately

2:30 a.m.), Kennedy was suspicious that the driver might be impaired. According to Kennedy, it is not uncommon to encounter impaired drivers at that time of night. Moreover, based on his experience, Kennedy believes that impaired drivers have a tendency to "over think things" and sometimes drive too cautiously. Accordingly, Kennedy decided to turn around and investigate further.

As Deputy Kennedy approached Defendant from the rear, he did not observe any erratic driving or law violation. Furthermore, Kennedy did not see any equipment violation. Kennedy's suspicion was aroused further, however, when – as Kennedy pulled even – Defendant slowed down even further, pulled into the left lane behind Kennedy, and then turned left at the first opportunity. It appeared to Kennedy that Defendant may be attempting to avoid him. Furthermore, the street onto which Defendant had turned was a dead end with just a few businesses, including a mini-storage facility. Kennedy was aware of a rash of storage shed burglaries in the Dubuque area at about that time. Accordingly, Kennedy decided to turn around again and investigate further.

As he was turning around, Deputy Kennedy observed that Defendant made a U-turn after turning onto the dead end road, and then headed in the same direction on Highway 20 that he was initially traveling. Accordingly, it was necessary for Kennedy to turn around a third time in order to catch up with Defendant. Before Kennedy caught up, Defendant turned left onto the side road, again at the first opportunity. Kennedy then effected the traffic stop.

Before stopping a vehicle, thereby implicating the Fourth Amendment, an officer must have "some minimal level of objective justification" for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The factors which may reasonably lead an experienced officer to investigate further "include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). Here, Deputy Kennedy observed Defendant traveling at an unusually slow rate of speed, which may be

an indicator of an impaired driver, and at a time when Kennedy regularly encountered impaired drivers. After Defendant became aware of Kennedy's presence in the area, he twice turned off onto side roads. A reasonable officer could conclude that Defendant was attempting to evade him. "[E]vasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Defendant suggests there are innocent explanations for his behavior. Defendant argues that it would not be unusual for a vehicle to be traveling below the speed limit while driving uphill. Also, if a driver intended to turn left, it would not be unusual to slow down further and pull behind another vehicle driving in the lefthand lane. Finally, if a driver was confused regarding the proper turnoff, that might explain why he pulled into a dead end road and immediately made a U-turn. However, a finding of reasonable suspicion does not require an absence of possible innocent explanations for the conduct. *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("The behavior on which reasonable suspicion is grounded need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances.") (quoting *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006)). "Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Id.*

In addition to Defendant's unusually slow driving and his actions which could reasonably be interpreted as evasive, Deputy Kennedy was aware of a rash of burglaries in storage facilities at about that time. Kennedy also knew that a mini-storage facility was located on the first road where Defendant exited Highway 20. Those facts, together with the time of night and Defendant's other driving behaviors, provided Kennedy with a reasonable, articulable suspicion that Defendant may be driving while impaired or may be involved in a burglary. The "minimal level of objective justification" for making a vehicle stop "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. "The Fourth Amendment does not require a policeman who lacks

the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). "On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Id.*

In support of his argument that Deputy Kennedy lacked reasonable suspicion to stop his vehicle, Defendant cites *United States v. Jones*, 606 F.3d 964 (8th Cir. 2010), and *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011). In *Jones*, the Court concluded that an officer lacked reasonable suspicion to stop a person who was walking in a high-crime area, wearing a long-sleeved hooded sweatshirt and "clutching the front area of his hoody pocket with his right hand." 606 F.3d at 965. In that case, however, there was no evidence that Jones was engaged in other criminal activity and he took no action to evade the officer. In *Liberal*, the Ninth Circuit found in a § 1983 action that "avoidance of the police, standing alone, does not give rise to a particularized, reasonable suspicion that a person is committing a crime." 632 F.3d at 1078. Here, however, Deputy Kennedy had additional information to support a finding of reasonable suspicion. Specifically, Defendant was driving 40 miles per hour on a four-lane divided highway at a time of night when impaired drivers were often encountered. In addition, Defendant had pulled onto a dead end road which had a mini-storage facility, while Kennedy was aware that there had been a rash of storage facility burglaries.

In *Ornelas*, the Supreme Court cautioned that the standards for determining what constitutes "reasonable suspicion" and "probable cause" are "not readily, or even usefully, reduced to a neat set of legal rules." 517 U.S. at 696. "They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Id.* While it may be a close question, I believe Deputy Kennedy was acting on more than an "inchoate and unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1 (1968). Instead, the information available to Kennedy constituted "particularized, objective facts which, taken together with rational inferences from those

facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 705.

### B. Did Kennedy's Dialogue with Defendant Violate the Fifth Amendment?

Defendant next argues that Deputy Kennedy interrogated him at the scene without giving him a *Miranda* warning, in violation of his Fifth and Sixth Amendment rights against self-incrimination and right to counsel. It has long been established that Officers must inform suspects of their *Miranda* rights before subjecting them to custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436 (1966). "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

Here, it is clear Defendant was in custody during the disputed conversations with Deputy Kennedy. Defendant had been arrested on the outstanding warrant and was sitting – handcuffed – in the back of Kennedy's squad car. It is also undisputed that Kennedy did not *Mirandize* Defendant prior to the disputed conversations. The Government argues, however, that Defendant was not "interrogated" within the meaning of *Miranda* and, alternatively, that the questioning fell within the "public safety" exception.

### 1. Interrogation

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Court addressed the issue of whether the respondent was "interrogated" in violation of the standards promulgated in the *Miranda* opinion. While transporting a suspect to the police station, one officer expressed his concern to another officer that a school for handicapped children was located nearby and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Id.* at 294-95. The respondent interrupted the conversation and told the officers to turn the car around so he could show them where the gun was located. The Court first noted that "the *Miranda* safeguards come into play whenever a person in

custody is subjected to either express questioning or its functional equivalent." *Id.* at 300-01.

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily on the perceptions of the suspect, rather than on the intent of the police. . . . But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02 (Italics in original). The Court concluded that it could not say that the officers should have known that it was reasonably likely that Innis would respond to their conversation and, therefore, no "interrogation" occurred. *Id.* at 303.

With this general principle in mind, the Court turns to the facts in the instant action. During their first conversation, Defendant called Deputy Kennedy back to the squad car as Kennedy was preparing to enter Defendant's vehicle. Defendant volunteered that there was "a dude coming down here" to get Defendant's car. After Kennedy expressed an intent to "pull the car ahead," Defendant then warned Kennedy that "he left something in my car." At that point, Kennedy asked Defendant about the "something" which was in the car. Specifically, Kennedy asked "is there meth in there?" When Defendant said there was no meth, Kennedy asked "alright, what's in there?" Defendant then referred to a black bag on the floorboard, and Kennedy asked "okay, what's in it?" When Defendant said he really didn't know, Kennedy asked, "will it hurt me?" In response, Defendant provided additional information to Kennedy, including a disclosure that "I know there's a can of ether in there." Kennedy then asked "well, does he have a one-pot in there?"

14

The Court concludes that the questions asked by Kennedy constituted an interrogation within the meaning of *Miranda*. That is, Kennedy engaged Defendant in "express questioning." *Id.* at 300-01. That determination does not, however, end the analysis. Rather, the Court must determine whether the custodial interrogation fell within the "public safety" exception.

### 2. Public Safety Exception

In *New York v. Quarles*, 467 U.S. 649 (1984), the Court recognized a "public safety" exception to the *Miranda* requirements. That is, certain cases present "a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*." *Id.* at 653. In *Quarles*, officers approached a rape suspect in a supermarket. The suspect, who was reportedly carrying a gun, attempted to flee. When officers apprehended him, he was wearing a shoulder holster which was then empty. The officer "asked him where the gun was," and the suspect responded "the gun is over there." *Id.* at 652. Although Quarles was surrounded by at least four police officers and was handcuffed when the questioning took place, and there was nothing to suggest that any of the officers were any longer concerned with their own physical safety, the Court nonetheless concluded that the exigencies of the circumstances provided an exception to the *Miranda* requirement.

> We hold that on these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. . . . Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives – their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

*Quarles*, 467 U.S. at 655-56.

The public safety exception can thus be summarized as follows:

> Under the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if *Miranda* warnings had not been given. The exception does not depend upon the questioning officers' subjective motivation. Rather, it is judged under an objective standard and "applies when 'police officers ask questions reasonably prompted by a concern for public safety.'" ***The public to be protected can include the officers themselves.***

*United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008) (citations omitted) (emphasis added).

Here, Deputy Kennedy's questions were prompted by Defendant's warning that "he left something in my car." Kennedy's questions were designed to elicit information regarding whether the "something" was dangerous. It is noteworthy that the Eighth Circuit Court of Appeals has repeatedly applied the public safety exception even *without* a warning by the suspect of the presence of danger. *See, e.g., United States v. Liddell*, 517 F.3d 1007, 1008 (8th Cir. 2008) (after removing a weapon from the defendant's car, officers asked "is there anything else in there we need to know about; that's gonna hurt us?"); *United States v. Luker*, 395 F.3d 830, 832 (8th Cir. 2005) (after arresting the defendant for driving drunk, the officer asked him "if there was anything that could stick or poke him," before performing a pat-down search).

The Court concludes that the conversation between Deputy Kennedy and Defendant, after Defendant called Kennedy back to the squad car, falls squarely within the public safety exception established in *Quarles*. First, Defendant initiated the conversation with Kennedy. Second, Defendant warned Kennedy that there was "something" in the car. Third, Kennedy's questions were intended to determine whether the "something" was dangerous. Accordingly, the Court finds that the questioning which occurred when

Kennedy initially returned to the squad car was not violative of the Fifth Amendment.[4] *See also United States v. Watters*, 572 F.3d 479, 482 (8th Cir. 2009) (without giving a *Miranda* warning, the officer asked the defendant if there was a gun somewhere in the vicinity); *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999) (the officers' question "is there anything we need to be aware of?" fell within the public safety exception).

The second encounter between Deputy Kennedy and Defendant occurred after Kennedy abruptly reacted to a strong odor apparently coming from a glass Mason jar in the backpack retrieved from Defendant's vehicle. As set forth in the facts above, Defendant initiated that contact by asking Kennedy several questions. Defendant volunteered that "he told me all that was in there was a thing of liquid heat and a can of starting fluid." This statement was *not* in response to any question by Kennedy. Kennedy then followed up by asking Defendant what Rick was driving, if he "lives down the hill by the park down there," and, finally, "how often are they cookin' out there?" While Defendant's responses to the questions regarding Rick are not particularly inculpatory, the Court concludes they are a product of a custodial interrogation which occurred prior to a *Miranda* warning. The questions posed by Kennedy at that time cannot fairly be attributed to the public safety exception. Accordingly, Defendant's responses to Kennedy's questions made during the contact after Kennedy removed the backpack from the car are violative of the Fifth Amendment and inadmissible at trial.[5] However, Defendant's volunteered statements prior to Kennedy's questions are admissible.

---

[4] The Court notes parenthetically that, like the respondent in *Quarles*, Defendant does not claim that his statements "were actually compelled by police conduct which overcame his will to resist." *Quarles*, 467 U.S. at 654.

[5] Defendant also asserts a violation of his Sixth Amendment right to counsel. However, the Sixth Amendment right to counsel does not attach until a prosecution is commenced and has no application to a defendant who makes inculpatory statements during an interrogation before a criminal proceeding is initiated. *United States v. Edelmann*, 458 F.3d 791, 803 (8th Cir. 2006).

## VI. SUMMARY

In summary, the Court concludes that Deputy Kennedy had a reasonable, articulable suspicion that Defendant was driving impaired, or otherwise engaged in criminal activity. Accordingly, the vehicle stop was not violative of the Fourth Amendment. The questions Kennedy posed to Defendant, after Defendant called Kennedy back to the squad car, fell within the public safety exception and, therefore, did not violate Defendant's Fifth Amendment rights. Accordingly, Defendant's motion to suppress Defendant's answers to those questions should be denied. After Kennedy removed the backpack from Defendant's car, Defendant asked Kennedy about his reaction to the backpack's contents and volunteered information regarding what Rick had told him about the backpack's contents. The volunteered information was not in response to an interrogation, and is admissible at trial. Kennedy followed up with a few questions regarding the activities of Rick Tuttle. Those questions do not fall within the public safety exception and, therefore, the answers are inadmissible at trial. To that limited extent, Defendant's motion should be granted. A defendant's Sixth Amendment right to counsel has no application here.

## VII. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that Defendant's Motion to Suppress (docket number 13) be **DENIED** in part and **GRANTED** in part. The conversation which occurred between Deputy Kennedy and Defendant after Defendant called Kennedy back to the squad car (as set forth on pages 5-7 above) should *not* be suppressed. The volunteered statements made by Defendant after Kennedy removed the backpack from Defendant's car (as set forth on pages 7-8 above) should *not* be suppressed. Defendant's answers to Kennedy's questions regarding Rick Tuttle should be suppressed.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange*

*promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."* Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 13, 2012.

DATED this 20th day of December, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA